2006 VT 106

# Carol J. Willey v. Philip Willey

[912 A.2d 441]

No. 05-251

Present: Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Toor, Supr. J., Specially Assigned

Opinion Filed November 3, 2006

422

*David F. Kidney* of *Rubin, Kidney, Myer & DeWolfe*, Barre, for Plaintiff-Appellee.

*Brian K. Valentine* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Husband Philip Willey appeals from the family court's final divorce decree awarding wife Carol Willey $210,000 and incorporating other terms of an oral settlement agreement reached by the parties during their divorce trial. Husband also appeals from the family court's subsequent order awarding wife attorney's fees and temporary maintenance. Because the family court's finding that the parties intended to be bound by the oral settlement agreement was not clearly erroneous, and because its decision to award attorney's fees and temporary maintenance was not an abuse of discretion, we affirm.

¶ 2. The parties were married in 1989; before marrying they executed, with advice of counsel, a prenuptial agreement. That agreement recited husband's "intent and desire . . . to provide adequately and fairly for [wife] and her minor children by a previous marriage," and also contained a seemingly-conflicting provision concerning "Marital Dissolution," which provided that "[i]n the event of a separation or divorce, the parties shall have no right against each other by way of claims of support, alimony, maintenance, compensation or division of any property . . . ."

¶ 3. Following their marriage, husband and wife built a home in Barre where they lived until separating in the summer of 2003. At all times during the marriage, husband owned a construction company from which he derived significant income; wife was employed at times in the construction company offices, and that employment was terminated when the parties separated.

¶ 4. During the subsequent divorce proceedings, husband filed a motion for specific performance of the prenuptial agreement and for partial summary judgment based on that agreement. The family court, after an evidentiary hearing in May 2004, issued a decision concluding that the most plausible reading of paragraph 2(b) (which recited husband's intent to "provide adequately" for wife and her children) was as "an expression of [husband's] agreement to 'provide adequately' for [wife] during and, especially, after the marriage." The court based this interpretation on the fact that paragraph 2(b) was the only change wife proposed to the draft prenuptial agreement and further concluded that "[t]o provide adequately means to make payments of money." The court then concluded, in light of the prenuptial agreement's severability clause, that the agreement's paragraph 8 (purporting to bar any claim by wife for maintenance or

support) would be set aside "in order to give meaning to [husband's] expressed intent to provide adequately for his wife" in paragraph 2(b).

¶ 5. The divorce case proceeded to a final hearing on September 22 and 23, 2004. Before the second day of the hearing, husband's attorney initiated settlement negotiations with wife's attorney, proposing to pay wife a lump sum, in exchange for which she would waive any further claim to the Barre house or to spousal maintenance. After wife's attorney consulted with wife, the parties orally agreed that husband would pay wife $210,000 and she would waive any claim to maintenance or to the house. Among other things, the parties also agreed to keep the $210,000 payment confidential, as husband was concerned about keeping his financial dealings as private as possible. The parties did not immediately reduce this agreement to a formal writing, but the meeting did result in a "term sheet" containing the basic terms of the agreement, annotated with notes made by husband's counsel. In addition, the parties prepared a list of wife's personal property left at the Barre house; each entry on the list was accompanied by "yes" or "no" in husband's handwriting to denote whether that item was to be removed by wife.

¶ 6. Following the settlement negotiations on September 23, counsel for both parties advised the family court in chambers that they had reached a settlement and the divorce trial could be terminated. The parties further advised the court that they would reduce the agreement to a writing "shortly." Before leaving the courthouse that day, husband's attorney handed wife's attorney a check for $50,000 made out to wife and signed by husband; the memorandum line on the check read "Toward Settlement." Neither husband nor his attorney stated that the check should be held in escrow pending execution of a written settlement agreement. Wife immediately deposited the check in her personal account, without objection from husband or his attorney.

¶ 7. In the next few days, wife's attorney sent two drafts of the settlement agreement to husband's attorney. Husband's counsel responded, on October 4, with a letter proposing several changes to the draft, none of which varied the terms of the draft as to the lump-sum payment, the quitclaim deed, or the need for confidentiality. On October 7, wife's attorney sent husband's attorney a new draft incorporating most of the changes proposed in the October 4 letter. Husband did not reply to this draft, and on October 22 new counsel filed her notice of appearance for husband. Since that date husband

has maintained that he never intended to be bound by the September 23 negotiations.

¶ 8. After it became clear that husband did not intend to sign the settlement agreement sent on October 7, wife filed a motion to enforce the terms of the settlement agreement. After an evidentiary hearing on the motion, the family court issued findings of fact and conclusions of law on April 27, 2005. The court found, in pertinent part, that husband's assertion that he did not intend to be bound by the oral negotiations was "not credible," that he had partly performed the agreement before later "chang[ing] his mind," and that the court would therefore enforce the settlement agreement. The family court directed counsel for wife to prepare a draft final divorce decree based on the April 27 findings of fact and conclusions of law.

¶ 9. A final decree of divorce was filed on June 1, 2005. By that decree, husband was awarded — and wife was required to quitclaim any interest in — the home the parties built together in Barre. Husband also retained sole ownership of his construction company and certain real estate in Calais. The decree mandated that husband would pay wife $210,000 "in the nature of a property settlement." Further, both parties renounced any claim against the other for attorney's fees incurred prior to October 7, 2004. Husband appealed from this order.

¶ 10. The first question presented for our review is whether the parties' oral settlement agreement, coupled with the attorneys' notes, unexecuted drafts, and other surrounding circumstances, created an enforceable agreement. Husband argues, first, that the family court erred in construing the prenuptial agreement to allow wife to make any claim for maintenance. Second, husband contests the family court's finding that the parties intended to be bound by their oral agreement on September 23, 2004. Finally, husband asks us to set aside the award of attorney's fees to wife, contending that the family court failed to properly consider wife's financial resources. We consider the second argument first.

¶ 11. Whether husband and wife will be bound by their oral settlement agreement depends on their intent at the time of the oral settlement, which is a question of fact. *Bixler v. Bullard*, 172 Vt. 53, 58, 769 A.2d 690, 694 (2001). We view the family court's factual findings in the light most favorable to the prevailing party below, disregarding the effect of modifying evidence, and will set aside factual findings only when they are clearly erroneous. *Catamount Slate Prods., Inc. v. Sheldon*, 2003 VT 112, ¶ 14, 176 Vt. 158, 845 A.2d

324. The findings will stand if there is any reasonable and credible evidence to support them. *Id.* As discussed below, we conclude that there was ample evidence supporting the family court's findings.

■ ¶ 12. In arriving at its findings, the family court relied on the four factors we adopted in *Catamount* to aid in determining whether parties intended to be bound by an oral agreement absent a fully-executed document. See *id.* ¶ 17 (citing four factors used in *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986)). First, we consider whether either party has expressly reserved the right not to be bound before the agreement is written down and executed; second, whether either party has partially performed the contract; third, whether all "substantive" terms have been agreed upon; and, fourth, whether the agreement is of a sort that is typically committed to writing. *Id.* Each of these factors, while not independently dispositive, provides "significant guidance." *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 323 (2d Cir. 1997).

■ ¶ 13. As to the first factor, there is nothing in the facts before us to suggest that either husband or wife expressly reserved the right not to be bound to the oral settlement agreement. Husband argues that the mere fact that the parties (and the family court) anticipated that the agreement would ultimately be set down in writing should be considered an express reservation of the right not to be bound to the oral agreement. We rejected such a broad rule in *Catamount*, however, and we decline to adopt it now. See *Catamount*, 2003 VT 112, ¶ 26 (declining to adopt a per se rule that settlement agreements be unenforceable absent a writing, and stating that "parties to a . . . settlement are free to enter into a binding oral contract without memorializing their agreement in a fully executed document, *even if* they intend to subsequently reduce their agreement to writing") (emphasis added).

¶ 14. The express reservation husband claims he made in this case would have us apply the logic of *Catamount* to very different facts. In *Catamount*, the parties submitted to binding mediation in order to settle several pending lawsuits between them. *Id.* ¶ 2. Prior to that mediation, the mediator drafted, and both parties received, a "Mediation Agreement" which mandated that no statements made during the mediation would be "binding upon either party unless reduced to a final agreement of settlement," and also provided that such a final agreement "must be in writing and signed by every party sought to be charged." *Id.* ¶ 3. Our decision in *Catamount* relied,

first, on this express prenegotiation language in finding that the parties had reserved the right not to be bound until a final agreement had been reduced to writing and signed. *Id.* ¶ 18. Second, we noted that the parties' correspondence following the mediation was "further evidence" that they believed they were not yet bound. *Id.* ¶ 19. Third, and "[e]ven more compelling," was the fact that a lease payment required by the purported oral settlement was escrowed until the agreement became "final." *Id.* ¶ 20.

¶ 15. Husband contends that the parties' actions and correspondence after the oral settlement agreement also reflect an express reservation of the right not to be bound. We cannot agree. Husband characterizes his failure to object when the family court congratulated the parties on reaching a settlement as "entirely reasonable" in light of his earlier experiences with the court. Be that as it may — and we express no opinion here — his mere silence, however justifiable, does not amount to an express reservation of the right not to be bound. The post-settlement correspondence cited, particularly when viewed in light of the parties' earlier actions — which are more fully discussed below — also does not satisfy the standard we articulated in *Catamount*. As the family court found, even husband's attorney characterized the written back-and-forth as a process of "fine-tuning" the "details" of the agreement, and advised wife's counsel that "[a]t this point that does it." As noted above, the changes husband proposed did not materially alter the central terms of the agreement. Finally, the fact that husband did not expressly require that the $50,000 check be put in escrow is evidence that he intended to be bound. The family court had sufficient credible evidence to find that husband did not clearly and unmistakably communicate his intent not to be bound by the oral settlement agreement.

¶ 16. The second *Catamount* factor, partial performance, also supports the family court's finding that the parties intended to be bound by the oral agreement. First, the family court found that, immediately following the oral settlement negotiations, husband's counsel handed wife a check for the $50,000 payment required by the agreement; the check was marked "Toward Settlement." Wife deposited this check immediately, without objection from husband or his counsel. At no time did husband or his counsel state that the check should be held in escrow pending a more final agreement. We see no error in the family court's conclusion that this was part

performance of the oral settlement agreement. Also, following the oral settlement agreement, the case was removed from the family court docket and wife removed certain agreed-upon personalty from husband's house. Both of these actions were part performance of the oral agreement. See *Brown v. Brown*, 343 A.2d 59, 62 (D.C. 1975) (holding that an oral agreement, partially performed by the agreed-upon withdrawal of a countersuit, was enforceable); see also *Schanck v. Jones*, 229 F.2d 31, 32 (D.C. Cir. 1956) (holding that "the compromising of legal proceedings and the relinquishment of rights in connection therewith (here, the alleged abandonment by appellant of her appeal in the divorce proceeding) are such part performance of an oral agreement" as to render it enforceable).

¶ 17. Although the third *Catamount* factor —"whether all of the terms of the alleged contract have been agreed upon" — does not weigh as heavily in favor of enforcement, neither does this factor militate very strongly against it. As the family court found, the parties had agreed on all the significant terms of the settlement. Although husband has contended, since October 22, 2004, that the drafts prepared by wife's attorney were deficient in failing to provide sufficient teeth in the confidentiality provision, he did not object to those provisions at the time, nor did he propose alternative terms. Husband's reliance on *Catamount* is misplaced here; in *Catamount* the terms remaining at issue during the drafting process included, among other things, the term of the disputed lease, the amount of property to be leased, and whether the parties' underlying claims would be dismissed without prejudice upon execution of the agreement. 2003 VT 112, ¶ 22. We held that "[r]esolution of these issues was clearly important enough to forestall final execution until the language of the documents could be agreed upon." *Id.* The issues raised by the attorneys' correspondence following the negotiations are hardly as material or central as the unresolved terms in *Catamount*, and there was sufficient evidence to support the family court's finding that the terms of the contract had been agreed upon during the September 23 negotiations.

¶ 18. The fourth *Catamount* factor has two aspects: first, whether the agreement at issue is of a type that is "usually committed to writing" and, second, whether the agreement is so complex that the parties could not reasonably have expected to be bound without a writing. *Id.* ¶¶ 17, 23.

■ ¶ 19. As to the first, the family court stated correctly that marital settlement agreements are invariably reduced to writing, and that the quitclaim deed renouncing wife's interest in the marital home would have to be in writing. 12 V.S.A. § 181(5). The family court went on to conclude that the Statute of Frauds did not bar enforcement of the oral agreement. Husband argues, first, that there were significant factual disputes about the terms of the oral agreement and, second, that the term sheet, *supra*, ¶ 5, does not satisfy the Statute of Frauds. We have already dispensed with the first argument. *Supra*, ¶ 16. We find the second argument unpersuasive as well. The Statute of Frauds is a rule of evidence, and does not make oral agreements per se void. *Troy v. Hanifin*, 132 Vt. 76, 80, 315 A.2d 875, 878 (1974). Because it is a rule of evidence, the Statute of Frauds may be waived by the party who would benefit from its application. *Chomicky v. Buttolph*, 147 Vt. 128, 131, 513 A.2d 1174, 1176 (1986). Here, husband argues only that the Statute of Frauds applies to that portion of the oral settlement by which wife agreed to give husband a quitclaim deed to the marital home as part of the consideration for his paying her the $210,000. Wife does not dispute that she must, under the agreement she seeks to enforce, execute the deed to husband in exchange for the $210,000. Husband does not raise any material dispute about the consideration he would give in exchange for the deed, although he contends that the absence of a writing setting forth: (1) the date for payment, (2) the tax status of the payment, and (3) who should prepare the deed, is fatal to the agreement. As the family court found, however, husband raised only minor drafting points in response to the draft settlement agreements prepared by wife. The record supports this finding. It would be an elevation of form over function to allow husband to use the Statute of Frauds to invalidate the entire settlement agreement under these facts. We decline to do so, and find no error in the family court's conclusion that the Statute of Frauds does not preclude enforcement of the oral settlement agreement.*

---

* Wife also argues that the doctrine of judicial admissions takes the oral settlement agreement outside of the Statute of Frauds. Even if that doctrine had been adopted by this Court, which it has not, it would not apply to admissions made in chambers off the record. Accordingly, because the doctrine would not affect our disposition of any issue were we to follow it, we express no opinion as to whether the doctrine applies generally in Vermont.

¶ 20. As to the second aspect — the complexity of the agreement — husband argues that the length of the draft agreements circulated between the parties compels the conclusion that the agreement was so complex that the parties could not reasonably have expected to be bound in the absence of a writing. The parties' draft agreement was almost ten pages long and included both an appendix and a supplemental agreement. The obligations imposed by the agreement were, in large part, to be discharged within thirty days of its execution, but the agreement also contained provisions binding the parties further into the future (e.g., an obligation to cooperate in any future tax audits of the other spouse).

■ ¶ 21. As we noted in *Catamount*, agreements of similar length and complexity to this one "warrant the expectation of a writing." 2003 VT 112, ¶ 23 (finding settlement agreement with "numerous, very specific terms governing the detailed operation of a slate quarry" and imposing obligations lasting several years sufficiently complex to require a writing); see also *Ciaramella*, 131 F.3d at 326 (finding that the complexity of an eleven-page settlement agreement with provisions applying "into perpetuity" militated in favor of requiring a formally executed writing); *Winston*, 777 F.2d at 83 (finding same as to a four-page agreement imposing obligations over several years). The family court's resolution of this factor in wife's favor appears to turn on the fact that, although the agreement was complex, there were no substantive differences between the parties about the terms orally agreed to on September 23, 2004. As was more fully discussed above in connection with the third *Catamount* factor, *supra,*¶ 17, there was sufficient evidence for the family court to find that the material terms of the contract were agreed to on September 23 and that the complexity of the agreement should therefore not stand in the way of enforcing it.

■ ¶ 22. In connection with the fourth factor, we also stated in *Catamount* that, where the parties to a purported oral settlement are adversaries in litigation, it is reasonable to suppose that "the parties would assume [the agreement] would be in writing." 2003 VT 112, ¶ 24. As a general matter, this is true, but it is not an inviolate principle. Rather, as the *Winston* court noted, it is a rule of "prudence." 777 F.2d at 83. In this case, the purposes — ease of enforcement and avoidance of litigation, *id.* — underlying this rule of prudence will be served at least as well by enforcement of the oral settlement. The agreement at issue here, in contrast to the lease in

*Catamount,* is readily enforceable without imposing the requirement that the parties set down a more formal written agreement.

¶ 23. On balance, we conclude that the family court did not err in finding that the parties intended to be bound by their oral agreement on September 23, 2004. We therefore affirm the family court's final divorce decree incorporating the terms of that agreement. Because we affirm the final divorce decree, we need not consider husband's argument that the prenuptial agreement barred wife's claim for maintenance.

¶ 24. Husband next challenges the family court's award of $19,221.50 to wife for attorney's fees she incurred attempting to enforce the terms of the oral settlement agreement. Husband's principal argument is that the family court's failure to consider the parties' ability to pay, or to make findings concerning the parties' respective financial abilities, was an abuse of discretion. We disagree.

¶ 25. Husband is correct that, in awarding attorney's fees in divorce proceedings (denominated "suit money" by 15 V.S.A. §§ 606, 607), consideration should be given to the parties' ability to pay. However, we do not require the family court to conduct a separate hearing and take additional evidence about the relative financial positions of the parties because those positions have typically been subject to extensive judicial scrutiny during the hearing on the merits. *Turner v. Turner,* 2004 VT 5, ¶ 9, 176 Vt. 588, 844 A.2d 764 (mem.) ("'In the usual, and vast majority of, [divorce] cases such allowance borders on judicial routine, and is supported by evidence bearing on the circumstances of the parties generally.'") (quoting *Ely v. Ely,* 139 Vt. 238, 242, 427 A.2d 361, 364 (1981)). Here, although the divorce proceeding was dismissed after the first of two scheduled days, the family court had already heard evidence concerning the parties' respective financial circumstances at an earlier hearing on wife's claim for temporary maintenance. Accordingly, we do not agree with husband that the family court failed to adequately consider wife's ability to pay, or that any further proceedings or findings were required before attorney's fees could be awarded.

¶ 26. Further, husband seems to misapprehend the nature of the ability-to-pay inquiry; the question is not simply whether the requesting party has the bare ability to pay, as husband implies. Rather, the inquiry is an equitable one, *Nevitt v. Nevitt,* 155 Vt. 391, 399, 584 A.2d 1134, 1139 (1990), and the family court has discretion to award attorney's fees even to a party who has received an award in

the underlying action sufficient to pay the fees. See, e.g., *Downs v. Downs*, 159 Vt. 467, 468, 472, 621 A.2d 229, 230, 232 (1993) (affirming award of attorney's fees to wife who had received over $200,000 in maintenance in underlying divorce action). We will affirm an award of attorney's fees unless it is an abuse of discretion. *Cleverly v. Cleverly*, 151 Vt. 351, 358, 561 A.2d 99, 103 (1989).

¶ 27. Here, the order awarding attorney's fees stated that "Mr. Willey owns and operates a successful ... company," that he "has virtually no debt," and that he has "certificates of deposit with local banks with a total value of close to $1,000,000." The family court further noted that wife had the "capacity" to earn approximately $30,000 per year as an office manager and was receiving $1,875 per month in temporary maintenance but had very few other assets. These facts amply support the award of attorney's fees to wife. We find no abuse of discretion.

*Affirmed.*