# Melissa Porcaro v. Mark Francis Drop

[816 A.2d 1280]

No. 01-177

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed December 27, 2002

*David Putter* and *Cassandra Edson* of *Putter & Edson, LLP,* Montpelier, and *Thaddeus Lorentz* of *Lorentz, Lorentz & Harnett,* Rutland, for Plaintiff-Appellant.

*Eugene Rakow* of *Biederman & Rakow, P.C.*, Rutland, for Defendant-Appellee.

¶ 1.  **Skoglund, J.** Mother appeals from a family court order awarding custody of the parties' minor child to father. Mother's claims of error consist of two basic contentions: (1) the court erred in failing to find that mother was the child's primary care provider, and to accord that fact sufficient weight and deference in its decision; and (2) the court impermissibly relied on mother's relocation out of state in its decision. We affirm.

¶ 2.  Although never married, the parties lived together for several years in Rutland, and had a child, born in April 1996. In May 1999, the parties separated. In October, they stipulated to a temporary court order awarding parental rights and responsibilities. The order provided that mother would retain physical rights and responsibilities, and the parties would share legal custody. Father was afforded substantial visitation, consisting of two weekdays, one overnight on weekends, and portions of holidays, vacations, and birthdays.

¶ 3.  Although the parties reunited in December 1999, they separated again in March 2000, whereupon they reverted to the provisions of the temporary order. Evidence showed, however, that father spent considerable time with the child beyond that specified in the order, including two days on weekends and other occasions when mother was unavailable. Also at this time, mother became acquainted through the Internet with a man named Maco Stewart, who resides in Los Alamos, New Mexico. In June, after two in-person meetings with Stewart in April and May, mother moved with the child to Stewart's residence in New Mexico. Father thereupon filed a contempt motion for interference with visitation, and mother filed a motion to modify parent-child contact.

¶ 4.  Following an evidentiary hearing, the court issued a written decision in March 2001. The court observed preliminarily that the October 1999 order was designed to be temporary. Therefore, the court defined its task as determining the custody placement that would serve the child's best interests, rather than whether there had been a substantial change of circumstances.[1] The court proceeded to review the statutory factors set forth in 15 V.S.A. § 665(b). The court found that both parties had the ability and disposition to provide the child with love, affection and guidance, to provide for the child's present and future developmental needs, and to foster a positive relationship with the noncustodial parent. The court further found that mother "was the

---

[1] Neither party has challenged this conclusion on appeal.

primary care giver during the child's first two years of life, although this has changed over time to become more equal." As to the parties' ability to provide the child with a safe and stable environment, and the child's relationships with others who may affect him, the court found that the evidence favored father. The court noted that father had held the same job for over nine years, was well-settled in his life and home, and had a network of family and friends actively involved with the child. The court further found that the child enjoyed good relationships with family and friends in the State of Vermont. Mother, in contrast, had recently moved to New Mexico, without prior notice to father or to the child's school or friends, in order to pursue a relationship with a man she had met several months earlier on the Internet and with whom she had spent little time. The man had recently moved out of his own marital home, and was in the process of obtaining a divorce. Mother was not employed in her new home, had no family in New Mexico, and few friends. The circumstances suggested, in the trial court's judgment, a lack of stability when compared with father, and supported the conclusion that father "can and will be better able to provide for [the child] on a daily basis in the future."

¶ 5. Based on these findings, the court concluded that the child's best interests would be served by awarding physical rights and responsibilities to father, and so ordered. By agreement of the parties, the court ordered shared legal rights and responsibilities. Mother was awarded substantial visitation, within the logistical limitations, including eight weeks during the summer, all of Christmas vacation, winter and spring vacations, and unlimited phone and e-mail contact. This appeal followed.

¶ 6. Mother's principal contention on appeal is that the trial court committed reversible error by failing to find that she was the primary care provider, and by further failing to accord that fact sufficient weight in its analysis. Our review of the court's findings and conclusion is deferential. "Given its unique position to assess the credibility of witnesses and weigh the evidence, we will not set aside the [family] court's findings if supported by the evidence, nor its conclusions if supported by the findings. In determining the best interests of the children in custody matters, the court may draw upon its own common sense and experience in reaching a reasoned judgment." *Payrits v. Payrits*, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000) (internal quotation and citation omitted); see also *Hoover v. Hoover*, 171 Vt. 256, 258, 764 A.2d 1192, 1193 (2000) (trial court's findings must stand unless, viewing

record in light most favorable to prevailing party, and disregarding modifying evidence, there is no credible evidence to support them).

¶ 7. Although mother asserts that the court made no finding identifying the primary care giver, the court, as noted, found that mother "was the primary care giver during the child's first two years of life, although this has changed over time to become more equal" between the parties. While open to some interpretation, the court's meaning is reasonably clear, to the effect that mother was initially the child's primary care provider but that over time father had assumed a substantial — possibly equal — role as caregiver. The court did not state precisely whether mother remains the primary care provider or whether both parties are now entitled to that label. See *Payrtis*, 171 Vt. at 54, 757 A.2d at 473 ("We have never held . . . that a court may not find that both parents qualify as the primary care provider or that neither parent so qualifies . . . ."). The finding, nevertheless, plainly addresses the issue and reasonably conveys the dynamic of the evolving family relationship as revealed through the testimony and exhibits. This is all that we require for purposes of appellate review. See *Harris v. Harris*, 149 Vt. 410, 414, 546 A.2d 208, 211 (1988) ("It is sufficient if the findings as a whole reflect that the trial court has taken the statutory factors into consideration, in so far as they are relevant, in reaching its decision.") (internal quotation and citation omitted).

¶ 8. Mother also contends the trial court erred because the evidence compelled an unequivocal finding that she was the primary care giver. Again, as reflected in the court's finding, the record reveals a more nuanced set of relationships. To be sure, father's testimony finds him continually assenting to counsel's suggestions that mother was the primary care provider. It is readily apparent, however, that the term did not have the same loaded meaning for father that it does for courts and lawyers. Thus, while father agreed at trial that mother was "the larger caregiver," he went on to explain in the same answer that "as [the minor] has gotten older, he's — you know, he comes right along with me pretty much wherever I go. . . . I mean, I've, I've done it all. I've changed diapers, fed, bathed, cleaned, everything . . . ." The same qualified response recurs in father's later testimony, where he again assents to counsel's suggestion that mother was the primary care provider, but further explained, "*we* cooked meals, *we* bathe him; she

woke him up in the morning. That's cause I was at work." (Emphasis added.)[2]

▮ ¶ 9. Extensive additional testimony supports the court's finding that although mother was initially the primary parent, father had taken an increasingly substantial role in caring for the minor. After the separation, as agreed by the parties, the minor spent Tuesday and Thursday, as well as Saturday through Sunday with father, and substantial additional time on outings, birthdays, vacations, and other occasions. Although mother claimed that the division of time was approximately 65% to 35% — if not more — in her favor, other witnesses testified that the division was more equal. It was also undisputed that mother had left the minor with father for four or five days in April 2000, when she went to New Mexico to meet the man with whom she had become acquainted on the Internet, and for another full week in May, when she went to Maine to meet the same man. Additional testimony also established that father and son were extremely close; that father was a loving, playful, and compassionate parent; and that the child was completely accustomed to having father care for him. Although mother cites her own and others' testimony suggesting that she, and not father, remained the child's primary care giver, this does not compel reversal of the court's finding, which was otherwise supported by credible evidence. *Payrits*, 171 Vt. at 52-53, 757 A.2d at 472. We thus discern no basis to disturb the court's finding that although mother was initially the primary care provider, the division of responsibilities had evolved over time to become more equal between the parties.

▮ ¶ 10. The additional weight to be accorded the primary care giver relationship depends on "the likely effect of a change of custodian on the child." *Id.* at 55, 757 A.2d at 473. The court's decision here satisfies this contingent standard. Although mother — and the dissenting opinion — fault the trial court for failing to give additional weight to the finding that mother was, at one time, the primary care provider, the record evidence of father's substantial involvement in all aspects of the child's life, and the mutual devotion of father and child, demonstrates that no additional weight was required in this case.

---

[2] At oral argument before this Court, father's counsel acknowledged that the evidence supported the court's finding that mother was initially the primary care provider, but that father had taken an increasingly substantial role in caring for the child.

¶ 11. Mother also contends the court impermissibly awarded custody to father based on mother's relocation to New Mexico. Although courts must generally defer to the custodial parent's decision to relocate, *Lane v. Schenck*, 158 Vt. 489, 495, 614 A.2d 786, 789 (1992), the court's findings here indicate that the parties' circumstances since their separation had evolved to become more like the de facto shared custody arrangement we addressed in *deBeaumont v. Goodrich*, 162 Vt. 91, 96, 644 A.2d 843, 846 (1994). Therefore, the court was not required to defer to mother's custodial status under the temporary order in evaluating the impact of her move on the child's best interests.

¶ 12. Finally, mother asserts that the court's ruling was motivated by its disapproval of her Internet relationship, and by a desire to "punish" her for moving in with Stewart after a relatively brief acquaintance. We discern no such motives in the court's findings or the record, nor any basis to infer such improper bias. See *Ball v. Melsur Corp.*, 161 Vt. 35, 39, 633 A.2d 705, 709 (1993) (judge is accorded a presumption of honesty and impartiality, and burden is on moving party to show otherwise).

¶ 13. This was a close case. We have repeatedly stated, however, that our review of custody matters is limited, and that we must defer to the judgment of the trial court applying its own common sense and experience. *Payrits*, 171 Vt. at 52-53, 757 A.2d at 472. The family court's ruling awarding custody to father reflects its reasoned judgment in light of the record evidence. Therefore, we may not disturb its decision, even if we were inclined to reach a different result. *Hoover*, 171 Vt. at 261, 764 A.2d at 1195 (we cannot set aside trial court judgment merely because we would have reached different conclusion).

*Affirmed.*

¶ 14. **Johnson, J.,** dissenting. The majority has failed to grasp the importance of the issue we confront in this case, that is, the appropriate legal structure for allocating parental rights and responsibilities between unmarried parents who live separately, when there is no family court order in effect and one party is indisputably the primary care giver. I would reverse because the trial court erroneously failed to agree with the parties that mother was the primary care giver of a preschool child; therefore it accorded no weight to that factor in determining the best interests of the child in a close case. The primary care giver doctrine is particularly relevant when the parties are unmarried and have de facto arrangements of custody and visitation. If it is applicable, as it is here, it is the only factor that acts as a cautionary barrier to a change in custody.

Because close scrutiny of requests to change custody has long been a mainstay of our family law jurisprudence, I respectfully dissent.

¶ 15. Ms. Porcaro and Mr. Drop met at a plastics factory in Rutland, Vermont, where they both worked. They have one child, who was born in April 1996. At the time, the parties were in an ongoing relationship and lived together in father's parents' home. Mother initially took an eight week leave from work to care for the infant. When she returned to work, the child went to day care. In the spring of 1997, the parties moved into an apartment of their own in Rutland. During this period, mother cared for the child during the day and worked the third shift at the factory. Father would care for the child at night, while mother worked. In May 1999, the parties moved out of the apartment they were sharing and the relationship ended. Mother moved with the child into her mother's home and father returned to his parents' home.

¶ 16. In October of that year, the Rutland Family Court issued a temporary order regarding parental rights and responsibilities, based on the parties' stipulation. That order called for the parents to have joint legal custody, while mother would have sole physical custody of the child. Father would have contact with the child two weekday evenings and one overnight on the weekends, and time on holidays would be split approximately equally. The order explicitly stated that it was temporary and would remain in force until further order of the court.

¶ 17. In the winter of 1999-2000, the parties attempted a reconciliation. Father moved in with mother in her apartment in Rutland. By March 2000, that attempt failed and father moved out, and the parties reverted to the parent-child contact schedule of the temporary order. In the spring of 2000, mother met Maco Stewart over the Internet. Mr. Stewart resides in Los Alamos, New Mexico, where he is employed by the federal government. After two meetings and extensive contact on the Internet with Mr. Stewart, mother moved to Los Alamos with the child in June 2000. Shortly thereafter, mother was engaged to Mr. Stewart, whom she has since married. Because of the move, father was unable to see the child on the weekly schedule the parties had adopted.

¶ 18. In response to several motions filed by father in an attempt to resume contact with the child, the family court held several days of hearings on the issue of parental rights and responsibilities. After hearing testimony from both parents, as well as several witnesses for each, the court issued findings and conclusions. The court's findings, twenty-three short sentences, were extremely sparse and do not begin to reflect the character of the relationships as revealed by the transcripts of two full days of testimony. In its conclusions, the court determined that because

the order of October 1999 was temporary, parental rights and responsibilities for the parties had never been conclusively determined. The court, therefore, set out to determine the parental rights and responsibilities based on 15 V.S.A. § 665(b), which directs a court to determine the best interests of the child based on nine factors. The court determined that it is in the best interests of the child for father to have sole physical custody with mother entitled to parent-child contact.

¶ 19. With respect to the primary care giver, the court concluded without discussion that, "[t]hough Ms. Porcaro was initially the primary care giver, this has changed over time to become more equal between the parties." The trial court's findings of fact are entitled to deference and will not be set aside unless clearly erroneous. V.R.C.P. 52(a)(2); *Nickerson v. Nickerson*, 158 Vt. 85, 88-89, 605 A.2d 1331, 1333 (1992). Indeed, the majority opinion is based on the acceptance of the court's finding that neither parent was the primary care giver. But, I cannot agree with the majority that this finding has any support in the record. Moreover, the finding is contradicted directly by the testimony of the parties, including father, and was conceded by father's counsel on oral argument before this Court.

¶ 20. At trial, father acknowledged that mother was the child's primary care giver. For instance, on *direct* examination father was asked:

Q: There's been a question as to who was the primary care giver of [the child] during his life. Um, do you have any opinions in that regard?
A: Um, I agree that Melissa was strongly the larger care giver than I was.

On cross-examination on the same point father was asked:

Q: Now, I believe you stated that, um, Melissa was the primary care giver during . . . the entire relationship up through to the time she left in June; is that correct?
A: Okay.

In fact, the transcript reveals that for each relevant period in the couple's history, both when they lived together and apart, father admitted that mother was the primary care giver. Additionally, the temporary order gave sole physical custody to mother, with father to have visitation. That order was the basis for the parties' parent-child contact at all times when the parties were not living together, and it was entered into by stipulation of the parties. Based on the uncontroverted record evidence, there is no

basis to uphold the trial court's determination that there was no primary care giver.

¶ 21.  The question presented, then, is whether the failure to find that mother was the primary care giver makes a difference in this case. Section 293 of Title 15 allows the family court to determine parental rights and responsibilities and parent-child contact "[w]hen parents of minor children . . . whether said parents are married or unmarried, are living separately [and] on the complaint of either parent." 15 V.S.A. § 293(a). When the court's jurisdiction is based on § 293, the court applies the statutory framework of § 665(b), even though the best interests determination of § 665 was designed to determine the parental rights and responsibilities for married parents who are separated or divorced. See *Bissonette v. Gambrel*, 152 Vt. 67, 69, 564 A.2d 600, 601 (1989) (upholding trial court's use of § 665(b) factors to determine custody of child). Section 293 places no limitation, other than establishing parentage, on when or under what circumstances an unmarried parent may involve the family court in the custody of the child, regardless of any de facto custody arrangement the parties may have. In other words, § 293 sets no bar or threshold determination for the court to make before it applies the multi-factored analysis of § 665.

¶ 22.  In contrast, in other settings where a more formal custody arrangement already exists (i.e., a final court order), a parent must show a "real, substantial and unanticipated change of circumstances" before a court will reexamine the allocation of parental rights and responsibilities according to § 665. 15 V.S.A. § 668. This prevents a court from getting involved in a family where there already is a parenting arrangement, and potentially disrupting that arrangement, without requiring the person seeking the change to identify some event or circumstance that requires altering the status quo. See *Kilduff v. Willey*, 150 Vt. 552, 553, 554 A.2d 677, 679 (1988) (noting, in relation to the predecessor statute to § 668, that "custody ought not to be modified without critical justification" because of the importance of stability in a child's life).

¶ 23.  Most of the factors of § 665 require the court to compare the two parents relative to each other with no one factor weighing more heavily than another. The one exception is § 665(b)(6), which calls on the court to evaluate "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development." 15 V.S.A. § 665(b)(6). For this factor, we have consistently held that if there is a primary care giver, that factor must be given greater weight, and the burden on the nonprimary care giver is higher to establish a basis for switching the child's physical custody. In *Harris v. Harris*, 149 Vt. 410,

418, 546 A.2d 208, 214 (1988), we established that the primary care giver factor "should be entitled to great weight unless the primary custodian is unfit." Although we declined to create a per se rule in favor of the primary care giver, the result in *Harris* requires "the court to look carefully at the desirability and impact of changing the primary custodian." *Id.* Thus, once one parent has been identified as the primary care giver, the court may no longer consider the parties to be on the equal footing they were on when the § 665(b) inquiry began. See *Nickerson*, 158 Vt. at 89, 605 A.2d at 1333 (court must give due consideration to primary custodian in evaluating child's best interests); *Bissonette*, 152 Vt. at 69, 564 A.2d at 601 (affirming award of custody of child born out of wedlock to mother because her role as primary custodian outweighed other factors that were unfavorable to her).

¶ 24. In cases such as this, when an unmarried parent's desire to have custody over a child would replace a long standing de facto custody arrangement,[3] the added weight accorded the primary care giver is the crucial element that ensures that courts do not disrupt existing custody relationships simply by comparing one parent to the other, without special reference to the custodial history. The primary care giver doctrine recognizes the need for stability in a child's life, and that it is likely to be in the child's best interest to remain with his or her primary care giver. Because § 293 gives virtually unrestricted access to family court for unmarried, separated parents, the primary care giver inquiry functions as an important gate keeper, much the way § 668 does, to require some added burden on the one seeking to change the existing arrangement. "Otherwise, if moved on the basis of only momentary changes of advantage or benefit, children might be rendered totally insecure by frequent switches in home and custody." *Kilduff*, 150 Vt. at 553-54, 554 A.2d at 679.

¶ 25. As a consequence, the trial court erred when it balanced the nine factors of § 665 because it did not accord any added weight to the primary care giver inquiry.[4] Although we have stated that it is difficult to determine exactly how much weight this factor ought to be accorded, "the court should ordinarily find that the child should remain with the primary custodian if that parent is fit." *Harris*, 149 Vt. at 419, 546 A.2d at 214. Certainly, there is no evidence that mother is unfit. Cf. *Rutherford v. Best*, 139 Vt. 56, 61, 421 A.2d 1303, 1306 (1980) (under guardianship statutes, to

---

[3] Indeed, this custody arrangement is to some degree a de jure one because of the temporary order, which gave mother sole physical custody and joint legal custody to both parties.

[4] Even if the court's finding could be interpreted to mean that mother *was* the primary care giver, the court still failed to accord this finding added weight as required by *Harris*.

find a parent "unsuitable," there must be a showing "that the child has been abandoned or abused by the parent, or that the child is without proper parental care or subsistence, education, medical, or other care necessary for his well-being"). The trial court acknowledged that this was a very close case, stating at the end of the first day of testimony that "it's very apparent . . . that both parents are good parents and both parents care very deeply about their child. . . . [B]oth have the ability to . . . raise the child." The court's decision, therefore, was the result of a simple balancing of evidence in a close case. Because the court found to the contrary, there is no mention of according a primary care giver greater consideration.

¶ 26. Although the trial court is accorded wide deference on review of custody determinations, *Nickerson,* 158 Vt. at 88, 605 A.2d at 1333, when the court found both parties to be loving parents who could provide a suitable home for the child, the added weight that ought to have been accorded to the primary care giver could have altered the result. Father was chosen only because the court perceived that mother's relationship with Mr. Stewart "indicate[s] the lack of stability in her life." The court did not identify any other reasons, based on the § 665(b) factors, for its result. This narrow finding, without more, may have been enough to justify giving father custody in an equal determination. This rationale, however, is not sufficient to warrant a determination in father's favor when mother should have been given the extra consideration due her.

¶ 27. In my view, the majority's holding jeopardizes the importance of our well-established primary care giver doctrine. If the doctrine does not have an impact in a case with these findings, then I can imagine no case where the status of primary care giver would ever have influence over the ultimate outcome. That is contrary to our law, and I respectfully dissent.